NOT DESIGNATED FOR PUBLICATION

No. 113,596

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of
D.B. (DOB XX/XX/12)
and
D.B. (DOB XX/XX/12).

MEMORANDUM OPINION

Appeal from Johnson District Court; KATHLEEN SLOAN, judge. Opinion filed December 18, 2015. Affirmed.

*Dennis J. Stanchik*, of Olathe, for appellant natural mother.

*Shawn E. Minihan*, assistant district attorney, and *Stephen M. Howe*, district attorney, for appellee.

Before SCHROEDER, P.J., PIERRON, J., and HEBERT, S.J.

*Per Curiam*:  D.B. the natural mother of twin girls, D'M.B. and D'N.B., appeals from the district court order terminating her parental rights. Mother contends the State failed to present clear and convincing evidence that she was an unfit parent or that her unfitness would unlikely change in the foreseeable future. Mother specifically attacks each and every ground upon which the court relied in terminating her rights. We affirm.

Mother gave birth to D'M.B. and D'N.B. in late August 2012, nearly 3 months premature. By mid-November 2012, the State had filed petitions seeking to declare each child to be a child in need of care (CINC) under K.S.A. 2014 Supp. 38-2234. The petitions alleged the children were living with Mother and maternal grandmother in an

apartment in Shawnee, Johnson County, Kansas. As a minor, Mother had been placed in the custody of the Department of Social and Rehabilitation Services, now the Department for Children and Families (DCF), in 2006. She had been removed from the home because of her mother's (Grandmother's) drug use. Ultimately, Mother was reintegrated with Grandmother in 2007.

In November 2012, DCF received a report indicating the children were the subject of possible neglect. Mother was receiving little or no assistance with the infants from Grandmother. The children had been released from the hospital on October 29, 2012, and were required to take medications and multi-vitamins but Mother had not obtained all the medications because of a lack of transportation. It was reported that Mother had no baby supplies and the children were sleeping in the same bed as Mother. DCF was especially concerned because Mother was overweight, thereby increasing the risk a child might be injured while sleeping with her. Several days later, the children were placed in a long plastic storage box lined with a blanket to sleep. Although the children had their first check-up with their pediatrician, Mother had not scheduled a follow-up appointment. At the time, Mother was not working but was receiving social security income. She had to rely on Grandmother or other family or friends for transportation.

Prior to the children's initial release from the hospital, hospital personnel reported they were concerned about Mother's ability to care for the children as she had little support at home and seemed to be easily overwhelmed. Mother even told a nurse she did not know if she could take care of the children. In addition, Mother showed immature behavior, wanting to sleep more than feed the children. Accordingly, the hospital arranged for home health services when the children were finally discharged.

After the children went home, a home health care agency was providing services every other day. When DCF visited the home on November 5, 2012, they saw only a few items of clothing for the children and only one can of formula. Mother knew the children

2

had various appointments at Children's Mercy Hospital South but did not have the dates or times written down. Mother declined family preservation services from DCCCA (formally known as the Douglas County Citizens Committee on Alcoholism) at that time.

At a visit 2 days later, DCF found the children sleeping together in a bassinet. Mother had attended a social service appointment the day before and received Women, Infant's and Children (WIC) support sufficient to buy ten cans of formula. Despite the mid-morning meeting, Mother appeared extremely exhausted and had difficulty following the conversation. She reported she had been up with one of the children. While Mother's home had more supplies, there were other concerns. DCF workers thought the children's clothing and diapers were too large and that Mother did not appear to know how to properly hold an infant because she did not fully support the child's head. Mother seemed somewhat rough when dressing one of the children and used a Q-tip to clean out the child's nose, causing it to bleed. DCF workers again encouraged Mother to make use of family preservation services. After being strongly recommended a third time by DCF, Mother agreed to accept family preservation services from DCCCA.

DCF interviewed one of the home health care workers helping Mother with the children. The worker reported it appeared Mother had some cognitive impairment and Grandmother provided Mother no assistance, acting as if the children were not even there. At one of the doctor's appointments, Mother fell asleep in the waiting room and a child had to be removed from her arms before she fell. In addition, Grandmother would constantly turn down the heat, making the apartment too cold for the children.

On November 9, 2012, DCF was advised that the pediatrician wanted the children admitted to the hospital for failure to thrive. D'M.B. had only gained 1/2 ounce per day and D'N.B. had not gained any weight since her release from the hospital. Mother was upset the children could not come home because there was a baby shower scheduled for the following Saturday. After being admitted to the hospital, the children gained weight

appropriately. Still, hospital personnel were concerned whether Mother could care for the children on her own. For example, Mother took the bottle away from the children even though they had not consumed the recommended volume of formula. In addition, Mother had trouble doing the basic arithmetic needed to properly fix the formula. Although Mother was at the hospital every day, she did not remember to give the children medication until prompted by nursing staff. Mother reported that she was planning on moving in with her sister in Wyandotte County. Hospital personnel reported that the aunt to the children would need to be a significant caretaker. However the aunt worked during the day and attended school at night.

DCF and DCCCA personnel meet with Mother and her friend at the hospital on November 13, 2012. They discussed Mother's plans to move in with her sister and her sister's work and school schedules. Throughout the meeting, Mother regularly interrupted the social service workers by commenting about her food cravings, checking her Facebook page, and discussing other matters not related to the services or her children. Mother stated she felt "forced" to accept DCCCA services and stated she did not believe she was a "'bad mom.'" During the discussions, she referred to one of the children as being a "'brat'" and used a vulgar name toward one of the children.

At the termination hearing, Jessica Sieker testified about DCF's initial involvement with the family shortly after the children's birth, as well as the time when Mother had been found a CINC when she was a minor. Sieker's testimony mirrored the allegations in the original CINC petition, including the initial lack of supplies, apparent cognitive issues, and the concerns of the home health care workers. During her first interactions with Mother, Sieker believed Mother did not grasp the seriousness of the children's needs and DCF's concerns. She also believed that Mother was overwhelmed in handling the children for the short time they had been out of the hospital. Mother seemed immature in other ways.

4

The State filed CINC petitions alleging Mother was unable to meet the day-to-day needs of the premature children and it was contrary to the children's interests in remain in the home at that time. A temporary custody hearing was held on November 15, 2012; Mother attended the hearing and was represented by counsel. The district court placed the children, who were still hospitalized, into the temporary custody of DCF.

After some difficulty, the State ultimately served the putative father of the children, M.S., with notice of the proceeding. At an adjudication hearing in January 2013, Mother filed a no contest statement in response to the CINC petitions. After paternity was confirmed, Father also filed a no contest statement in response to the CINC petitions. The children were ultimately adjudicated as CINCs at a hearing in March 2013. The district court ordered that KVC prepare a 6-month reintegration plan with each parent while the children remained in DCF custody.

In April 2013, a 6-month reintegration plan between KVC and Mother was filed with the court. Mother was ordered to maintain stable housing with working utilities and obtain employment or complete a GED program. Mother was ordered to use her KVC-scheduled visitation time and spend equal amounts of time with each child. Mother's visitation was to be supervised until the KVC case manager found it unnecessary. Mother was to take parenting classes and seek help from KVC if she felt overwhelmed with parenting. She was required to complete a Level II Psychological Evaluation and follow any recommendations. Mother was ordered to provide verification of the completion of her tasks. Subsequently, Mother was ordered to pay $100 per month in child support. The reintegration plans were extended an additional 90 days following a September 2013 review hearing.

Elizabeth Mohney, Mother's first KVC caseworker, testified at the termination hearing she had worked with Mother when DCF first became involved with the family. The initial goal of the case plan was to establish paternity and to reintegrate the children

5

with one of the parents. Mohney worked with Mother between November 2012 and April of 2013. She provided Mother with a copy of the original reintegration plan effective from March to September 2013 and reviewed it with her. During Mother's visits, Mohney was concerned with Mother's lack of knowledge of basic safety issues. Mohney had to repeatedly caution Mother on how to properly hold the children and on safety issues. During her time working with Mother, Mohney did not see Mother's skills extend beyond the very basic level. However, Mother did appropriately administer breathing treatments to the children. Mother never brought bottles, diapers, or other supplies to visits. Those were provided by the foster family. Mother's language toward the children was not always appropriate. She would say they were fat or had an evil face. Mohney noted that Mother was occasionally overwhelmed with the children during the 1-hour visitations. However, Mohney did see a bond developing between Mother and the children.

Mohney was concerned about Mother living with Grandmother, and it was recommended that Mother work toward obtaining independent housing; Mother had acted by registering for Section 8 housing. During this time, Mother had scheduled, supervised visits with the children twice a week for an hour. She was transported to these visits by friends and family members. When Grandmother transported Mother to visitations, Grandmother did not interact with the children and usually fell asleep during the visits. Mother moved into subsidized housing in Kansas City, Kansas, in July 2013.

Mother's reintegration plan also contained educational or vocational goals. She had been directed to complete a GED or arrange for vocational training. Mother signed up for a diploma completion program but switched to a GED program, thus not making progress toward the educational requirement. Mother also was to take an age-appropriate parenting class. She had completed a parenting class, but Mohney had referred her to an age-appropriate parenting class. Likewise, Mother was scheduled to complete a psychological examination before Mohney was transferred off the case. Mohney worked with Mother for 4 to 5 months on the case plan goals.

Donald Jones, a clinical psychologist, testified he had performed a psychological evaluation of Mother. He also had observed Mother and the children together. Jones' evaluation was completed based upon examinations in April and June 2013. Mother was 21 years of age at the time of the assessment and showed some signs of long-term depression and having suffered some trauma in her life, including being removed from her home due to Grandmother's drug use. Mother tested as having average to below average intelligence. The test results also indicated Mother had some cognitive limits as to manipulating words or numbers to solve complicated problems. Jones noted that Mother was overweight and fatigued easily. She also faced psychosocial stressors of having her children in foster care. Jones was concerned about Mother living with Grandmother as they were not emotionally close, even though Grandmother's apartment was considered a safe environment. Also, Mother still exhibited some adolescent attitudes that raised concerns for a person who must care for young children.

Jones noted Mother was very nurturing to her children and interacted with them appropriately. She exhibited stress because of having no prior experience with children. Jones recommended Mother undergo psychotherapy to address her depression and that she work with Parents as Teachers regularly to learn day-to-day parenting skills. Jones believed she could learn parenting skills with ongoing outside support. Mother would need continuing help if she moved out on her own and regained custody.

Ashley Franden, a KVC case manager, was assigned to the family in September 2013. Although Mother's reintegration plan was originally set to be completed within 6 months, it was extended 90 days, through December 2013. A new permanency plan was adopted in October 2013. During Franden's involvement, KVC purchased cribs and mattresses for the children. However, Mother did not pick up the items for several months, even after several reminders by Franden. By this time, Mother had obtained Section 8 housing. Franden did a walk-through, noting the apartment was not completely

7

baby-proofed and there was little food in the apartment. During an in-home visit the next month, the home had improved. In January 2014, Franden was required to intervene with Mother's landlord to prevent Mother from being evicted because of neighbors' complaints of noise, foot traffic, and other problems.

In January 2014, the State filed a motion to terminate Mother's parental rights or to appoint a permanent custodian for D'N.B. and D'M.B. The petition cited the numerous problems Mother had in failing to complete many of her tasks despite KVC's efforts to assist her. The State alleged Mother appeared to lack the ability to understand the importance of her assigned tasks. The State asserted that the children had been in DCF custody for over a year and that neither parent had demonstrated the ability to safely care for the children in a stable environment.

Although a motion to terminate had been filed, KVC continued to work with Mother. During Franden's supervision, from January to April 2014, Mother did not complete many of her tasks. Mother was not employed during that period. Franden confirmed that Mother established a connection with a vocational rehabilitation center in January 2014 and was starting that process. This program helped her get to job interviews, but she had not been hired. During visitations, Mother did not use physical discipline, but Franden had to caution Mother about her tone of voice and choice of words in her interactions. During part of this period, visitation was changed to supervised visitation in Mother's home. Mother initially failed to provide the correct size of diapers. Mother ultimately completed a psychological evaluation that recommended psychotherapy and cognitive therapy. Mother started therapy, although she missed the first 3 to 4 months of appointments—September to November 2013—before she began to regularly attend.

Franden further testified that Mother continued to have problems completing some of the reintegration tasks. Mother failed to obtain her high school diploma or a GED.

Franden reminded Mother several times that she needed to provide proof she was working toward completing her tasks. Although Mother reported completing infant care parenting classes, she did not provide proof to KVC. Nor did Mother pay any child support in 2014.

Mother had problems attending visitations and appointments because of transportation issues, especially during the 90-day extension period. She often relied on family or friends to take her to visits or appointments. From September 2013 to June 2014, KVC provided Mother with bus passes. KVC provided her with gas cards as well. Mother never asked for assistance in determining bus schedules. The bus system did not have a stop adjacent to the KVC offices, and a walk was required from the nearest stop. Franden encouraged Mother to obtain a driver's license, but she had failed the driving test twice. There was testimony that Mother knew how to drive and had driven before; however, she had not been properly licensed to do so.

Mother often cancelled visitations with the children because of transportation issues. During some of the visitations no problems were noted about Mother's actions. However, during one visit, Mother picked the children up by the arm or shoulder and she failed to change the children's diapers. On other occasions, Mother had to be prompted repeatedly to check the children's diapers and instructed that wet diapers needed to be changed, even if the child did not want to cooperate with the change. Mother needed to be reminded how much water should be mixed with the formula and to interact with the children on the floor at their level. When the children switched to solid food, she would put too little food on the spoon, so the children would get impatient. Although Mother was shown an appropriate amount of food to feed the children, she did not change her actions because she was afraid the children would choke. Parents as Teachers attended visitations monthly to help Mother understand where the children should be at developmentally.

9

Because visitations with Mother improved in late December and throughout January, KVC began in-home visitations between her and the children. These visitations were 2 hours long, once a week. Mother enjoyed time with them, but she would check her phone more frequently and tended to watch the children more than interact with them. Although Mother had been advised in advance to have diapers, wipes, and snacks on hand, she did not have those available. During an earlier walk-through of the apartment, Franden had noted the place was relatively empty. Mother had outlet coverings on the electrical outlets, but there were no locks on the cabinets. Still, Mother had placed all chemical items in higher cabinets. The only additional safeguards recommended by Franden were baby gates around the stairs.

On the second in-home visit, Mother's sister provided diapers, but they were too small for the children. During the third in-home visit, Franden again observed Mother interacting with the children. However, when D'M.B. put the plug from a lamp in her mouth, it was Franden who had to correct the child's behavior and instruct Mother of the danger. Mother would verbally tell the children to stay away from the window blinds but never got up to physically move them elsewhere. Several subsequent home visits took place without any issues. In early March, during an in-home visit with Mother, Franden had to instruct her to either turn off the television during the visitation or turn the channel to a child-friendly show. They took the children outside to play. Franden noticed broken glass scattered on both the sidewalk and in the grass. Mother had to be instructed to clean up the glass. Other home visitations in March went well. The children were hospitalized in late March for several days due to a virus causing respiratory problems. Mother visited the children while they were in the hospital.

In April 2013, the case plan shifted to adoption. According to KVC policy, Mother's visitations were moved back to KVC offices. Mother missed at least one visitation due to transportation problems after this change.

The district court held a termination hearing on August 14, 2014, and September 19, 2014. During the trial, social workers from DCF and KVC who had worked with Mother and the children testified, as did a clinical psychologist who had evaluated Mother.

Franden summarized the reasons supporting termination during her testimony, despite her acknowledgment that the children had bonded with Mother and Mother clearly loved her children. Franden testified Mother had not adequately completed her reintegration plan during the 9 months it existed. She had not obtained her high school diploma or obtained a GED. She did not possess adequate financial resources to support a family budget. She had not obtained means for her own transportation or completed a formal transportation plan. She failed to provide proof she had completed age-appropriate parenting classes and had not fully participated in individual psychotherapy due to missing a number of sessions. In addition, Mother had failed to complete a budget after Franden had given her the forms to do so several times. Mother missed approximately 12 visits with the children due to transportation problems. She also did not seem to understand the seriousness of the proceeding, her obligations, and the special health issues of the children. Mother's sister advised Franden they were expecting too much of Mother. The sister stated Mother functioned at the level of a 15 or- 16-year-old person.

Franden testified that it was her opinion, based on Mother's circumstances and efforts, as well as her interation with other support providers and the children, that it was in the best interests of the children to terminate Mother's parental rights. Franden did not see evidence that Mother's circumstances were likely to change in the foreseeable future.

During the September portion of the termination hearing, Mother testified on her own behalf. She testified she was 20 when the children were born and was 22 at the time of the trial. Mother testified that as required by the reintegration plan, she was receiving individual therapy and had seen a therapist every month for about 1 year. Mom testified

11

she had learned to deal with the situation of her children being in State custody and how to use breathing techniques when she was feeling overwhelmed and stressed. She learned that some things happen that may not be her fault, and she had to deal with those issues and approach others about them without being angry. She learned that in dealing with issues, she should talk to her therapist or a family member about the problem. She believed she had better coping skills to deal with stress as compared to when the case started. Mother testified she got upset because people believed she was unfit and she could not properly raise her children. She was upset because she kept trying but believed she did not get credit for trying to do better. Mother testified she had attended two or three parenting classes, including a baby parenting class where she learned how to properly hold, bathe, feed, and talk with her children. She had taken a class in April 2014 about disciplining children recommended by her therapist and presented a certificate of completion. Mother testified the children had bonded with each other and with her.

Mother testified that when the case first started, she was living with Grandmother in an apartment in Shawnee. At the time, Grandmother was a reliable source of transportation for Mother. However, case workers had told Mother to find her own independent living. With the assistance of her sister, she found a place for herself and the children in Wyandotte County. She moved into the apartment in July 2013, and she still lived there at the time of the trial. She renewed the lease, which she thought extended her contract for a year. She was receiving SSI benefits of $181 per month and social security death benefits from her father's account of $435 a month. When she had custody of the children, she received an additional benefit for each child because they were born prematurely. She would be entitled to receive benefits for the children until they were 5 years old if they were reintegrated with her.

Mother had begun working with a job coach 4 or 5 months before the trial. Just before the second hearing, Mother had been offered a part-time job at $10.50 an hour. The job was in North Kansas City, and she had bus passes to get there. Mother testified

she had access to a vehicle she had recently bought even though she did not have a driver's license. However, the car was not insured and had not been titled and registered in her name. Mother testified she had found a day care for the children when she went to work, but she had not asked how much the day care would cost.

Mother testified she had attended a GED program up until the beginning of 2014. She stopped because it was stressful. Mother ultimately opted to look for employment instead. Mother admitted to switching back and forth between the diploma completion program and the GED program and finishing neither. Mother complained that after the motion to terminate was filed, the KVC workers had not cared anymore or inquired whether she was taking steps to change. However, Mother did not know when the motion to terminate was filed. On cross-examination, she testified that things changed 2 or 3 months before the trial.

Mother acknowledged receiving the 6-month reintegration plan shortly after her children were removed from her custody. She agreed she did not have her reintegration tasks completed by September 11, 2013, as originally required. She believed her transportation issues had been resolved due to her possession of an unregistered and uninsured vehicle. Mother admitted she had missed "quite a few" of her therapy appointments, but she had attended them consistently in recent months. She had taken an infant parenting class in April of 2014, long after the initial reintegration plan was established. Mother testified she had missed some visitations, even though she had been given bus passes. She did not understand the bus system, and she had never looked up the various bus schedules that could get her close to KVC's offices.

The district court took the matter under advisement and on March 12, 2015, issued its ruling. The court summarized the series of events leading up to and following the CINC adjudication. The court cited the social workers' testimony that Mother frequently needed redirection from them in the proper way to hold the children, for feeding them

13

enough, and for checking their diapers. The court cited Mother's inappropriate references about the children. The court found that although Mother had obtained independent housing, the case manager had to intervene with the landlord to prevent Mother from being evicted. The court emphasized Mother's failure to take age-appropriate parenting classes or provide proof such classes were completed.

The district court found Mother had failed to significantly comply with the reintegration plan. As examples, the court cited Mother's missed appointments for individual psychotherapy; her failure to complete her GED because she changed between two different programs; her failure to provide proof that she completed tasks; and her failure to attend numerous visitations and other appointments because of transportation problems, even though KVC provided her with bus passes. Based upon the record, the court found Mother was unfit due to her lack of progress toward reintegration. She never moved beyond monitored or supervised visitation. The court found KVC had expended numerous resources toward rehabilitation, which failed. The court further found that Mother's unfitness was unlikely to change in the immediate or foreseeable future. The court again emphasized that none of the professionals in the case were comfortable in allowing Mother unsupervised visits and had spent considerable time reminding Mother of basic caregiving skills and her obligations. Based on professional opinions, the court found that Mother could not assimilate information at a level appropriate for the safety and care of her children. The children had been in DCF custody for over 2 years, and Mother was still not close to being ready to parent them. The court found the children needed permanency and it was in the best interests of the children for Mother's rights to be terminated. Accordingly, the court ordered that Mother's rights to D'N.B. and D'M.B. be terminated and granted DCF the authority to consent to the adoption of the children.

Father's rights to the children were also terminated in the March 2015 order. He filed a timely, but unverified, notice of appeal. However, no appeal was ever docketed on Father's behalf.

14

Mother appeals.

On appeal, Mother contends the State failed to prove any of the statutory factors cited in the court's opinion by clear and convincing evidence. She makes a multifaceted attack on each of the statutory factors.

The Kansas Legislature has specified that the State must prove "by clear and convincing evidence" that a parent is unfit and that her unfitness was unlikely to change in the foreseeable future. K.S.A. 2014 Supp. 38-2269(a). When evaluating whether the State has carried its burden of proof, the appellate court's standard of review requires more than the typical "substantial competent evidence." Instead,

> "when an appellate court reviews a trial court's determination that a child is in need of care, it should consider whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e*., by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

See also *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011) (applying standard of review). In making this determination, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

The termination of parental rights statute lists nonexclusive factors the court must consider in making a determination of unfitness. K.S.A. 2014 Supp. 38-2269(b). The court must also consider a separate list of nonexclusive factors when children—such as in this case—are not in the physical custody of the parent. K.S.A. 2014 Supp. 38-2269(c). Any one of the factors in K.S.A. 2014 Supp. 38-2269(b) or (c) may, but does not

15

necessarily, establish grounds for termination of parental rights. K.S.A. 2014 Supp. 38-2269(f). Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2014 Supp. 38-2269(g)(1). In making such a determination, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2014 Supp. 38-2269(g)(1).

In her brief, Mother first challenges the definition of "reasonable efforts" as contained in K.S.A. 2014 Supp. 38-2269(b)(7). She contends this requires interpretation of the statute and thus is subject to unlimited review. See *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015) (interpretation of a statute is a question of law over which appellate courts have unlimited review). Mother contends that the Revised Kansas Code for Care of Children's policies of preserving family relationships requires DCF and its contractors to provide more services to preserve the family and that these policies should guide what constitutes reasonable efforts by social service agencies.

Mother argues, for the first time on appeal, that multiple elements of the reintegration plan developed by KVC and approved by the district court, in fact, undermined any chance she could be reintegrated with her children. However, nowhere in the record did Mother or her trial attorney question or challenge the provisions of the reintegration plan. Instead, Mother's position throughout the proceeding appeared to be that she substantially complied with the plan and had made great strides toward completing it. Generally, new issues will not be considered for the first time on appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011).

Mother argues the plan's requirement that she establish a residence independent from Grandmother was unreasonable because of the safety of Grandmother's home and the economic burden living independently would impose on Mother who was only 20 years old and had premature children. However, there was evidence that Grandmother

16

provided little or no emotional support to Mother and Grandmother's prior drug use had resulted in Mother being out of the home for a year as a young teenager. In addition, Grandmother provided no assistance with the children and developed no relationship with the children, even during visitations she attended with Mother. Moreover, despite the fragility of the infants, Grandmother kept reducing the temperature in the apartment so it was too cold for the children. Mother was successful in finding subsidized housing where the rent was only $69 per month and she was able to maintain her utilities with her income.

Next, Mother argues that KVC's independent housing requirement imposed the extra burden of transportation issues that caused her to miss a number of visitations. Mother asks us to take judicial notice of information not provided to the district court, namely locations of bus stops and the distance between the nearest bus stop and KVC's offices. As stated, this evidence was not presented to the district court. Moreover, Mother's testimony does not support the claim that the distance between the bus stop and the KVC offices had anything to do with her missed visits. Instead, Mother testified she did not understand that the bus passes would be able to get her to Johnson County from her residence in Kansas City, Kansas. She did not understand the routes, and she had made no effort to figure out the routes of the buses to Johnson County. Thus, Mother's request we take judicial notice of the bus routes is rejected.

Mother challenges the reintegration plan's requirement that she obtain a high school diploma or GED as not being rationally related to her specific needs to raise and support her children. In light of Mother's failure to complete a budget, however, it was unclear whether she would be able to support herself and the children based on her SSI benefits and her father's death benefits. The financial issues remained even in subsidized housing and even if extra benefits for the children were made available. This is especially true since her father's death benefits were reducing and the children's benefits would expire in several more years.

17

Even if the GED requirement was "unnecessary," Mother was given the option of obtaining employment. After vacillating between GED and diploma completion programs for over 9 months, Mother finally started to see a job coach only 4 to 5 months before the trial, several months after the motion to terminate was filed. Mother did not obtain employment until September 2014, nearly 2 years after the CINC proceeding began. This delay either speaks to the importance of the GED for purposes of obtaining employment or, alternatively, Mother's serious lack of effort to find employment. Moreover, her failure to determine the cost of the day care she was planning to use while she was working established an inability to plan for the future.

Mother also contests the district court's finding she had failed to adjust her circumstances or conditions to meet the needs of her children as set forth in K.S.A. 2014 Supp. 38-2269(b)(8). While Mother spends some time belittling Sieker's testimony, it should be noted that Sieker testified to a number of concerns that were included in the CINC petition. Significantly, Mother had filed a no contest statement in response to the CINC petition. Thus, Mother's arguments that none of the evidence relating to her actions prior to the filing of the CINC petition could form a basis for the finding of unfitness is untenable. Mother did not appeal from the CINC finding, and that information is certainly relevant to determining her fitness and whether she had adjusted her circumstances to meet the needs of her children.

Mother goes further to discount the caseworkers' testimony because the children's physical development had rendered their observations moot. However, there was consistency between the caseworkers' testimony throughout the 2 years of the case. At whatever stage of development the children were, Mother needed to be prompted repeatedly to take appropriate action for their care, whether it was checking their diaper, making sure they were in safe surroundings, redirecting them from unsafe behaviors, and ensuring they had adequate supplies and food. While the caseworkers noted some

18

improvements, those improvements never reached the level where Mother was allowed unsupervised visitation.

The district court also found that Mother had failed to maintain regular visitation with the children during their out-of-home placement as provided under K.S.A. 2014 Supp. 38-2269(c)(2). Mother reiterates her argument that the transportation issues that caused her to miss visitations were created by the reintegration plan's various requirements and her unsubstantiated assertions that the bus passes and gas cards were inadequate. However, the record is clear that Mother had no reliable means of transportation and was dependent totally on others to get her to visitations. Moreover, the missed visits strained Mother's ability early on to bond with the children. While the visitations became more consistent, especially when the children were brought to Mother's home, it was still her responsibility to make use of the bus passes and gas cards provided to her to meet the visitation schedule.

Mother challenges both the district court's determination that she had failed to comply with a reasonable reintegration plan and failed to provide financial support for the children while they were in out-of-home placement. While Mother complains it was KVC's fault that she did not complete the reintegration plan, she never challenged the plan's requirements while before the district court. It was not until the September 2014 termination hearing that Mother provided proof that she had completed age-appropriate parenting classes or that she had obtained a part-time job. This was 22 months after the CINC cases were initiated and 18 months after the first reintegration plan was put into place.

Mother's ability to care for the children without supervision was never achieved.

While the original psychological evaluator opined that Mother was capable of learning parenting skills, that opinion was made in June 2013. Despite nearly 6 months of

individual therapy, 9 months of visitations, and KVC support, Mother still had not shown adequate parenting skills to warrant unsupervised visitation. Despite several months of therapy, Mother still showed immature judgment regarding a number of issues which negatively reflected on her ability to manage her own life, not to mention the lives of young children.

Mother also challenges the child support order issued in a separate proceeding as being unreasonable due to her limited income. In the initial CINC proceeding, Mother was ordered to pay $100 per month in child support. Mother argues extensively about a modified child support order entered by default ordering her to pay $293 per month in child support based on an assumption she could work 40 hours per week at a minimum wage job. Again, this issue was not raised in the district court. It is clear, however, Mother made no payments, even minimum partial payments of support. This lack of at least minimal payments, during a time Mother contended she could financially support the children if they were in the home, appears to be inconsistent.

Even if Mother lacked the ability to pay support, all the other reasons the district court relied upon in terminating her parental rights are supported by clear and convincing evidence. Although Mother clearly loved her children and made efforts to comply with the reintegration plan, her progress during the 2 years the case was pending was minimal, especially in the areas of showing she possessed the ability and judgment adequate to care for the children.

The children had been in DCF custody for all but 2 months of their lives. They were bonded to both Mother and their foster parents. The record reflected that Mother's cognitive ability to adjust her circumstances was limited and she did not understand the importance of the tasks she was assigned to complete. In light of her limited accomplishments during the 2 years the case was pending, there was clear and convincing evidence that Mother's condition and circumstances would not change in the foreseeable

future. Most importantly, the district court and this court must consider the "'foreseeable future . . . from the child's perspective, not the parent['s], as time perception of a child differs from that of an adult.' [Citations omitted.]" *In re R.S.*, 50 Kan. App. 2d 1105, 1117 336 P.3d 903 (2014).

In her final issue, Mother contends the district court abused its discretion in finding the termination of her parental rights was in the best interests of the children. She argues the best interests determination is essential to the entry of an order terminating parental rights. K.S.A. 2014 Supp. 38-2269(g)(1).

We have recognized that the district court is in the best position to decide what is in the best interests of the children before it in a CINC case. As a result, the district court's decision on matters of the best interests determination will not be reversed on appeal in the absence of an abuse of judicial discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255 (2010). A district court abuses its discretion only when it bases its decision on an error of fact or law or when its decision is so unreasonable that no one would agree with it. *In re M.H.*, 50 Kan. App. 2d 1162, 1175, 337 P.3d 711 (2014).

Mother argues that her bond with the children and the strength of their relationship mitigated against a best interests finding in support of termination of her parental rights. However, the record reflects the children had also bonded with their foster parents, they were somewhat medically fragile due to their premature births, and consistency and permanency were important. Although Mother was close to family members other than Grandmother who had provided her some assistance, there simply is no basis to conclude the district court abused its discretion in finding that continuing the uncertainty of the children's future with Mother after 2 years of effort was in the children's best interests.

This is a close case. Mother has parenting skills. She has apparently tried hard. However, she has not been able to achieve the level of parenting skills necessary to care

21

for these fragile children. Due to the need for permanency, we find the inadequate level of parenting skills Mother has makes it necessary for us to affirm the district court's finding the Mother's parental rights should be terminated. We affirm.